STATE OF CONNECTICUT *v.* JASON DAY
(14418)

PETERS, C. J., and CALLAHAN, BERDON, KATZ and PALMER, Js.

Argued February 6—decision released June 27, 1995

*Richard Emanuel,* assistant public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Jonathan Benedict,* assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this capital felony appeal is the extent to which the defendant's imperfect self-representation is a ground for affording him a new trial. The defendant, Jason Day, was charged with one count of capital felony in violation of General Statutes § 53a-54b (8), four counts of murder in violation of General Statutes § 53a-54a (a), and one count of assault in the third degree in violation of General Statutes § 53a-61 (a) (1).[1] The defendant represented

[1] General Statutes § 53a-54b provides in relevant part: "CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

General Statutes § 53a-54a provides in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the

himself during a portion of his jury trial, and he thereafter was found guilty on all counts. At a subsequent penalty hearing held pursuant to General Statutes § 53a-46a, the trial court concluded that the state had failed to adduce sufficient evidence from which the jury reasonably could have found that the state had established the existence of an aggravating factor beyond a reasonable doubt. The trial court therefore concluded that the defendant could not be subjected to the death penalty and instead imposed a total effective sentence of life imprisonment without the possibility of parole. See General Statutes § 53a-46a (f).[2] The defendant appealed his convictions directly to this court pursuant to General Statutes § 51-199 (b) (3).[3] We affirm the judgment of the trial court.

reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

General Statutes § 53a-61 provides in relevant part: "ASSAULT IN THE THIRD DEGREE: CLASS A MISDEMEANOR. (a) A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he recklessly causes serious physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon, a dangerous instrument or an electronic defense weapon."

The original information also charged the defendant with risk of injury to a child in violation of General Statutes § 53-21 and carrying a pistol without a permit in violation of General Statutes §§ 29-35 and 29-37 (b). After the evidentiary portion of the trial had concluded but prior to the jury deliberations, the state filed a substitute information withdrawing those counts.

[2] General Statutes § 53a-46a provides in relevant part: "HEARING ON IMPOSITION OF DEATH PENALTY. AGGRAVATING AND MITIGATING FACTORS. . . . (f) . . . If the jury or, if there is no jury, the court finds that none of the [aggravating] factors set forth in subsection (h) exist . . . the court shall impose a sentence of life imprisonment without the possibility of release . . . ."

[3] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for capital felony . . . ."

The jury reasonably could have found the following facts. In early 1990, the defendant resided in a one bedroom apartment in Bridgeport with his girlfriend, Lisa G.; Lisa's brother, Raymond G.; Raymond's girlfriend, Theresa H.; Gloria S.; and Theresa's sons, five year old George G. and two year old Marcus G. Sometime before 10 p.m. on March 19, 1990, the defendant shot and killed Raymond G., Lisa G. and George G. in the apartment. The defendant also shot and killed Theresa H. while she was in her car in the parking area of the apartment house and dragged her body to an adjacent storage shed. Either before or after shooting Theresa H., the defendant repeatedly struck her in the head with the blade of a snow shovel. Each victim was shot in the head from close range. Marcus G., who was present in the apartment when the shootings took place, had been slapped in the face by the defendant but had not been shot.

The defendant thereafter drove Theresa H.'s car to a hospital in New York City, where he requested treatment under an assumed name and was diagnosed as having a fractured toe. Although he was scheduled for surgery, the defendant left the hospital before the operation was due to be performed. He subsequently was apprehended in a hospital in Baltimore by agents of the Federal Bureau of Investigation (FBI) on charges of unlawful flight to avoid prosecution. While in custody, the defendant confessed his role in the killings to FBI agents. Further facts will be related as necessary to address specific claims.

On June 12, 1990, the day after the defendant was charged in a multicount information, he was afforded legal representation by the appointment of William Holden, the public defender for the judicial district of Fairfield. One month later, at the defendant's probable cause hearing, Patrick J. Culligan of the trial services unit in the office of the chief public defender also

entered an appearance on the defendant's behalf. On March 4, 1991, against the advice of both attorneys, who still purported to represent him at the time, the defendant filed a pro se motion for a speedy trial. The trial court, *Ronan, J.*, ruled that the motion was effective upon receipt and set the case to begin trial no later than thirty days after the filing date.

Three weeks later, on March 26, 1991, the defendant moved in open court to waive his right to counsel and to represent himself. After canvassing the defendant, the trial court, *McKeever, J.*,[4] granted the defendant's motion and simultaneously appointed Culligan as standby counsel. Throughout the entire voir dire, which commenced the following day and continued sporadically through the middle of May, 1991, the defendant represented himself, though standby counsel was present.

The state began presenting its evidence to the jury on May 20, 1991. During the first day of the trial, four witnesses testified. Before the trial resumed on the following day, May 21, the defendant requested that his standby counsel be reappointed to represent him. The trial court immediately granted his request, appointed Culligan and Holden and adjourned for the day.

On May 22, Culligan and Holden moved for a mistrial. When their motion was denied, they requested a thirty day continuance. The trial court acceded to the request for a continuance, but only for thirteen days, until June 4, 1991. On that day, after counsel's renewed request for a longer continuance was denied, the presentation of evidence to the jury resumed. The jury returned a verdict of guilty on all counts on July 22,

---

[4] With the exception of the speedy trial motion; see part II of this opinion; all trial court proceedings mentioned in this opinion occurred before *McKeever, J.*

1991. Because the state failed to establish the existence of an aggravating factor at the penalty hearing, the defendant was not sentenced to death.

On appeal, the defendant argues several grounds for reversal of the judgment against him. To some degree, each claim except the last relates to his decision to represent himself during the initial portion of the trial. The defendant asserts that the trial court improperly: (1) accepted his waiver of the right to counsel and permitted him to represent himself; (2) granted his pro se motion for a speedy trial while he still was represented by counsel; (3) denied his request for a mistrial upon reappointment of counsel; (4) denied various defense motions during voir dire; (5) upon reappointment of counsel, granted a continuance only for two weeks rather than for the one month requested; and (6) failed to instruct the jury on the "two witness" rule, which failure resulted in his conviction upon insufficient evidence. We disagree with each of these contentions and conclude that the judgment of conviction must be affirmed.

I

We first consider the defendant's claim that the trial court improperly granted his motion to waive his right to counsel and to proceed pro se. The defendant presents two separate claims: (1) that the trial court incorrectly ruled that he was competent to make the decision to waive counsel; and (2) that even if he was competent, his waiver decision was not made knowingly, voluntarily and intelligently. Our analysis of these claims requires examination of the contours of the right to self-representation and of the relevant standards by which to measure a defendant's decision to exercise that right.

## A

Both the federal constitution and our state constitution afford a criminal defendant the right to forego the assistance of counsel and to choose instead to represent himself or herself at trial. As a matter of federal constitutional law, the right to self-representation is premised on "the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged."[5] *Faretta* v. *California*, 422 U.S. 806, 818, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); see also *McKaskle* v. *Wiggins*, 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); cf. *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (incorporating sixth amendment against states). The Connecticut constitution is more explicit, stating directly that "[i]n all criminal prosecutions, the accused shall have a right to be heard *by himself* and by counsel . . . ." (Emphasis added.) Conn. Const., art. I, § 8. We repeatedly have interpreted this language to establish an independent state constitutional guarantee of the right to self-representation. See *State* v. *Townsend*, 211 Conn. 215, 218, 558 A.2d 669 (1989); *State* v. *Williams*, 203 Conn. 159, 167, 523 A.2d 1284 (1987); *State* v. *Carter*, 200 Conn. 607, 611, 513 A.2d 47 (1986); *State* v. *Gethers*, 197 Conn. 369, 376, 497 A.2d 408 (1985) (*Gethers II*); *State* v. *Gethers*, 193 Conn. 526, 532–33, 480 A.2d 435 (1984) (*Gethers I*).

Neither the federal nor the state constitution, however, requires that a defendant be permitted simultaneously to exercise the right to self-representation and the right to counsel. *McKaskle* v. *Wiggins*, supra, 465 U.S. 183; *Gethers II*, supra, 197 Conn. 382. Indeed,

---

[5] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

those rights present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. " 'When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins.' *Gethers I,* supra, [193 Conn.] 534. Put another way, a defendant properly exercises his right to self-representation by 'knowingly and intelligently' waiving his right to representation by counsel." *State* v. *Townsend,* supra, 211 Conn. 220.

"The right to appear pro se exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." *McKaskle* v. *Wiggins,* supra, 465 U.S. 176–77; see also *Faretta* v. *California,* supra, 422 U.S. 833–34 (allowing defendant to elect self-representation consistent with framers' belief in "the inestimable worth of free choice"); *State* v. *Carter,* supra, 200 Conn. 613 (right "affords protection to the defendant's interest in personal autonomy"). It is also consistent with the ideal of due process as an expression of fundamental fairness. "To force a lawyer on a defendant can only lead him to believe that the law contrives against him." *Faretta* v. *California,* supra, 834.

We harbor no illusions that a defendant's decision to waive counsel and proceed pro se generally will lead to anything other than disastrous consequences. See id., 838–39 (Burger, C. J., dissenting). Nonetheless, the values informing our constitutional structure teach that "although [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' *Illinois* v. *Allen,* 387 U.S. 337 [350–51, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)] (Brennan, J., concurring)." *Faretta* v. *California,* supra, 422 U.S. 834.

## B

While a defendant has an absolute right to self-representation, that right is not self-executing. A trial court in this state must satisfy itself that several criteria have been met before a criminal defendant properly may be allowed to waive counsel and proceed pro se. "A waiver [of the right to counsel] will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant: (1) Has been clearly advised of his right to the assistance of counsel, including his right to the assignment of counsel when he is so entitled; (2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent himself; (3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and (4) Has been made aware of the dangers and disadvantages of self-representation." Practice Book § 961.

At the same time, we have recognized that this test " 'cannot be construed to require anything more for an effective waiver of counsel than is constitutionally mandated, because such a waiver triggers the constitutional right of an accused to represent himself.' " *State* v. *Townsend,* supra, 211 Conn. 220; *Gethers I,* supra, 193 Conn. 534. The multifactor analysis of § 961, therefore, is designed to assist the court in answering two fundamental questions: first, whether a criminal defendant is minimally competent to make the decision to waive counsel, and second, whether the defendant actually made that decision in a knowing, voluntary and intelligent fashion. See *Molinas* v. *Commissioner of Correction,* 231 Conn. 514, 523, 652 A.2d 481 (1994) (standards for waiver of constitutional right).

As the United States Supreme Court recently recognized, these two questions are separate, with the former

logically antecedent to the latter. "The focus of a competency inquiry is the defendant's mental capacity; the question is whether he [or she] has the *ability* to understand the proceedings. . . . The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." (Citation omitted; emphasis in original.) *Godinez* v. *Moran*, 509 U.S. 389, 401 n.12, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993). The defendant challenges the factual findings by the trial court both as to his competency and as to the knowing and voluntary nature of his waiver. We address these issues in order.

1

The defendant first claims that he was not competent to make the decision to waive the right to counsel. As a result, the defendant argues, he could not validly have waived that right despite his desire to do so. The trial court's decision allowing him to proceed pro se, therefore, violated his right to counsel guaranteed under the sixth and fourteenth amendments to the federal constitution and article first, § 8, of the state constitution.[6] We disagree.

Our analysis of this claim begins and ends with the United States Supreme Court's decision in *Godinez* v. *Moran*, supra, 509 U.S. 389. In that case, the court held that the same standard used to determine competency to stand trial also applies to determine competency to plead guilty or to waive the right to counsel. The decision is grounded in two posited equivalencies:

---

[6] Because denial of the right to counsel constitutes a structural defect rather than a trial error, it is not subject to harmless error analysis. See *Arizona* v. *Fulminante*, 499 U.S. 279, 309–10, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (Rehnquist, C. J.); *Chapman* v. *California*, 386 U.S. 18, 23 and n.8, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

(1) that the decision to plead guilty is equivalent to the sum total of decisions a defendant would be required to make at trial; and (2) that the competency required to waive the right to counsel is equivalent to the competency required to waive other constitutional rights incident to a guilty plea.[7] Id., 2686–87; see also *Myers* v. *Manson*, 192 Conn. 383, 389–91, 472 A.2d 759 (1984) (prior to *Godinez*, suggesting that unitary conception of competency is preferred approach). The result of the transitive analysis employed by the court is that any criminal defendant who has been found competent to stand trial, ipso facto, is competent to waive the right to counsel as a matter of federal constitutional law.

The United States Supreme Court's opinion does not mandate a particular test for competency, explicitly recognizing that "[s]tates are free to adopt competency standards that are more elaborate" than the formulation used in federal court. *Godinez* v. *Moran*, supra, 509 U.S. 402; see *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (competency to stand trial in federal court depends on whether defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him' "). A state does not, therefore, impermissibly burden the exercise of the right to self-representation by adopting a competency standard more protective than the *Dusky* formulation. Whatever standard is employed, however, it must be applied equally at the various stages of a trial to pass constitutional muster.

---

[7] "Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. . . . Second, is the right to trial by jury. . . . Third, is the right to confront one's accusers." (Citations omitted.) *Boykin* v. *Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969).

The *Godinez* decision has been criticized for failing to recognize that competency evaluations necessarily entail a contextual inquiry, the results of which should not be imported automatically from one situation to another. Justice Blackmun argued in dissent that "[a] finding that a defendant is competent to stand trial establishes only that he is capable of aiding his attorney in making the critical decisions required at trial or in plea negotiations. The reliability or even relevance of such a finding vanishes when its basic premise—that counsel will be present—ceases to exist." *Godinez* v. *Moran*, supra, 509 U.S. 412–13; see generally "The Supreme Court—Leading Cases," 107 Harv. L. Rev. 144, 159 (1993) ("the *Godinez* Court settled for a one-size-fits-all definition of competency that ignores the realities of mental illness").[8]

For present purposes, however, the question is settled until such time as the United States Supreme Court chooses to revisit it. Under *Godinez*, we are bound to rule that a defendant who has been found competent to stand trial as a matter of state law also is competent to waive the right to counsel. Application of a stricter competency test in the latter analysis than was used in the former would place an unconstitutional burden on the exercise of the defendant's federal constitutional right to self-representation.

In this case, the defendant repeatedly[9] was determined to be competent to stand trial under the *Dusky*

[8] Prior to *Godinez*, courts were split on the question whether to apply varying standards of competency. See cases cited in *Godinez* v. *Moran*, supra, 509 U.S. 395 n.5; *Myers* v. *Manson*, supra, 192 Conn. 391 n.8.

[9] A team of state examiners first evaluated the defendant on March 21, 1991. They found the defendant competent to stand trial under both prongs of General Statutes § 54-56d "without qualifications." Following a second evaluation held on June 25, 1991, in which two of the three clinicians who had conducted the first evaluation participated, the team concluded that the defendant was able to understand the proceedings against him, but it was unable to decide whether he was able to assist in his own defense. The

standard as codified in General Statutes § 54-56d (a).[10]
On appeal, the defendant has not challenged the propri-
ety of those determinations.[11] The defendant also has
not argued that state constitutional law requires the
application of some standard other than the *Dusky* for-
mulation to determine that he was competent to stand
trial. Consequently, we conclude, as the trial court held,
that the defendant was competent to waive his right
to counsel.

2

Competency, however, involves only the first half of
our analysis. Having determined that the defendant
was competent to waive the right to counsel, we next
must determine whether the trial court properly found
that the defendant actually did waive that right in a
knowing, voluntary and intelligent manner.

The trial court's canvass of the defendant on his
motion to waive appointed counsel and represent him-
self occupies twenty-nine pages of the printed tran-
script. During its canvass, the trial court specifically
addressed each issue enumerated in Practice Book
§ 961, in addition to other factors recognized in our case
law as bearing on the decision to waive counsel. See

defendant thereafter was ordered committed to Whiting Forensic Insti-
tute for a third evaluation on July 3, 1991. The staff at Whiting found the
defendant to be competent to stand trial. Further competency evaluations
were conducted at Whiting in the fall of 1991 following the defendant's
conviction and before the penalty phase, and he again was found compe-
tent to stand trial.

[10] General Statutes § 54-56d provides in relevant part: "(Formerly Sec.
54-40). COMPETENCY TO STAND TRIAL. (a) COMPETENCY REQUIRED. DEFI-
NITION. A defendant shall not be tried, convicted or sentenced while he is
not competent. For the purposes of this section, a defendant is not compe-
tent if he is unable to understand the proceedings against him or to assist
in his own defense."

[11] The defendant filed a motion for a mistrial on July 11, 1991, following
the second competency evaluation; see footnote 9; on the ground that he
was incompetent during the trial. That motion was denied, and the defend-
ant has not renewed that claim on appeal.

*State* v. *Townsend,* supra, 211 Conn. 221 (discussing age, education, mental health, prior experience with criminal trials and prior consultation with counsel as factors relevant to defendant's intelligence and capacity to waive counsel). The defendant does not dispute that this colloquy occurred, but he argues that, given the circumstances of this case, it did not go far enough. We disagree.

With respect to the knowing and intelligent nature of his waiver, the defendant presents two arguments. First, he maintains that § 961 (2), by referring to the "intelligence and capacity to appreciate the consequences of the decision to represent himself," imposes a threshold standard on a defendant seeking to waive counsel higher than simple competency to stand trial. This argument is foreclosed by our obligation to follow *Godinez* v. *Moran,* supra, 509 U.S. 389.

Next, the defendant asserts that the trial court's inquiry into his understanding of "the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case"; Practice Book § 961 (3); was too superficial to support a constitutionally valid waiver of counsel. He also maintains that the trial court failed adequately to impress upon him the dangers inherent in self-representation. See Practice Book § 961 (4). As a result, he argues, the record is inadequate to support a finding of a constitutionally valid waiver of the right to counsel.

The defendant, however, misunderstands the nature of the inquiry that is required. "[A] defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . *Faretta* v. *California,* supra, [422 U.S.] 835. Rather, a record that affirmatively shows that [he] was literate, competent, and under-

standing, and that he was voluntarily exercising his informed free will sufficiently supports a waiver. Id.; *Gethers I*, supra, [193 Conn.] 536." (Internal quotation marks omitted.) *State* v. *Townsend*, supra, 211 Conn. 221. In this case, the defendant clearly articulated his understanding that he was charged with capital felony and multiple counts of murder and that he faced a range of punishments, including the possibility of life imprisonment or the death penalty. After a long discussion of the pitfalls awaiting a pro se defendant, he also informed the trial court of his disagreement with the adage that a person who represents himself has a fool for a client. We conclude, therefore, that the record amply establishes that the defendant knew "what he [was] doing and his choice [was] made with eyes open. *Faretta* v. *California*, supra, 835, citing *Adams* v. *United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 2d 268 (1942)." (Internal quotation marks omitted.) *Gethers II*, supra, 197 Conn. 381.

The defendant also argues that we should look to events occurring after his waiver of counsel was accepted as evidence of his lack of understanding of the consequences of this decision at the time it was made. The defendant cites no authority, however, that such an inquiry is constitutionally compelled. We need not decide whether such an ex post facto inquiry is appropriate, however, because in this case none of the events relied upon by the defendant would change our conclusion that his decision was knowing and intelligent. Cf. *United States* v. *Hurtado*, 47 F.3d 577, 583 (2d Cir. 1995) ("fact that [defendant's] decision to represent himself was ultimately unwise does not render it involuntary").

With respect to the voluntary nature of his waiver decision, the defendant argues that the record does not indicate that he freely elected self-representation. In particular, the defendant points to a passage in the

waiver canvass in which he stated that "if I could have a lawyer I would." As the defendant acknowledges, however, when placed in proper context, the clear import of this statement is that while he would have accepted private representation if it had been available, he would choose self-representation over a court-appointed public defender.[12] Even so, the defendant argues, the ambivalence evident in that statement reflects that his decision to waive counsel was not wholly voluntary and therefore constitutionally ineffective.

" 'When a defendant is faced with the choice of proceeding with counsel he is not entirely happy with or defending pro se, the trial judge must satisfy himself that if the defendant chooses to proceed pro se, he does so knowingly, with a full understanding of the risks involved.' *Cordoba* v. *Harris*, 473 F. Sup. 643, 637 (S.D.N.Y. 1979)." *Gethers II*, supra, 197 Conn. 380–81. This requirement, in effect, simply restates the rule that a waiver of the right to counsel must be clear and unequivocal. *Faretta* v. *California*, supra, 422 U.S. 835; *State* v. *Carter*, supra, 200 Conn. 612, and cases cited

---

[12] The defendant's statement was made during the following colloquy with the trial court:

"The Defendant: I—I am not really trying to impress upon the court that I really wholeheartedly—that I can stand up and meet the challenge of the situation and that is to say that if I could have a lawyer I would.

"The Court: You can have a lawyer. Maybe I didn't understand you.

"The Defendant: Excuse me. On my own—at my own expense then I would but just as what you just said of fool, a fool represents himself or to say nothing less, I think that I would be just a biggest fool as to put my life in the hands of attorneys who are appointed by the state against the state, I think one hand washes the other and regardless of what the situation may be, that is my situation.

"The Court: Well let me tell you that it is the opinion of the court that you are totally, absolutely wrong if you feel that because you have the benefit of the public defenders that that places you at some disadvantage. I have had personal experiences with Mr. Holden on many, many occasions and I frankly would consider Mr. Holden to be one of the finest trial lawyers in this state."

therein. As we already have discussed, the defendant in this case was fully apprised of the risks inherent in self-representation. He nonetheless made his position abundantly clear that he would rather risk self-representation than proceed to trial with public defenders as counsel. See footnote 12. In the circumstances of this case, the fact that the defendant would have retained private counsel could he have afforded to do so does not render his decision to waive representation by his court-appointed counsel involuntary. Cf. *State* v. *Hamilton*, 228 Conn. 234, 249–50, 636 A.2d 760 (1994); *State* v. *Beaulieu*, 164 Conn. 620, 628–29, 325 A.2d 263 (1973); 2 W. LaFave & J. Israel, Criminal Procedure (1984) § 11.4 (d).[13]

We accordingly reject the defendant's challenge to the trial court's decision allowing him to waive his right to counsel. We conclude that the defendant was competent to waive that right and that he did so in a knowing, voluntary and intelligent manner.

## II

The defendant next argues that the trial court, *Ronan, J.*, improperly accelerated his case to "on trial" status after the filing of his motion for a speedy trial pursuant to General Statutes § 54-82m.[14] The grava-

---

[13] The trial court repeatedly informed the defendant during the period when he was representing himself that he could have counsel reappointed at any time simply by asking. When the defendant requested at the start of the second day of the trial that his original attorneys be reappointed, that request was granted immediately.

[14] General Statutes § 54-82m provides: "RULES RE SPEEDY TRIAL TO BE ADOPTED BY JUDGES OF SUPERIOR COURT EFFECTIVE JULY 1; 1985. In accordance with the provisions of section 51-14, the judges of the superior court shall make such rules as they deem necessary to provide a procedure to assure a speedy trial for any person charged with a criminal offense on or after July 1, 1985. Such rules shall provide that (1) in any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence within twelve months from the filing date of the information or

men of this claim relates to standing. First, the defendant points out that he was represented by counsel at the time the motion was filed. Second, he notes that he filed the motion personally, over the opposition of his attorneys. Third, he maintains that the decision whether to seek a speedy trial under § 54-82m represents a tactical issue for the attorney, rather than the client, to decide. As a result, the defendant insists that (1) he had no standing to file the motion while still represented by counsel, (2) the trial court, therefore, had no jurisdiction to entertain his pro se motion, and (3) the harm that resulted from the trial court's improper ruling requires reversal of his conviction. We disagree.[15]

---

indictment or from the date of the arrest, whichever is later, except that when such defendant is incarcerated in a correctional institution of this state pending such trial and is not subject to the provisions of section 54-82c, the trial of such defendant shall commence within eight months from the filing date of the information or indictment or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed. Such rules shall include provisions to identify periods of delay caused by the action of the defendant, or the defendant's inability to stand trial, to be excluded in computing the time limits set forth in subdivision (1)."

Practice Book § 956B provides in relevant part: "[SPEEDY TRIAL]—TIME LIMITATIONS. . . .

"(b) Except as otherwise provided herein and in Sec. 956C, the trial of a defendant charged with a criminal offense on or after July 1, 1985 . . . shall commence within eight months from the filing of the information or from the date of the arrest, whichever is later, if the following conditions are met:

"(1) the defendant has been continuously incarcerated in a correctional institution of this state pending trial for such offense; and

"(2) the defendant is not subject to the provisions of Gen. Stat., § 54-82c. . . ."

[15] We disagree with the state's argument that this issue was not properly preserved for appeal. Defense counsel reported to the court during the hearing on March 6, 1991, that counsel was taken by surprise by the motion and was not prepared at that time to respond. For the next court date, defense counsel had prepared a detailed motion and supporting mem-

For purposes of our analysis, we will assume arguendo that the defendant's request related only to a nonconstitutional, statutory speedy trial right; see generally *State* v. *Mooney*, 218 Conn. 85, 114–25, 588 A.2d 145 (distinct constitutional and statutory speedy trial rights), cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); and that defense counsel typically is empowered to waive such a statutory right, even over a client's objections. See generally *State* v. *Davis*, 199 Conn. 88, 95–96, 506 A.2d 86 (1986), and cases cited therein; 1 A.B.A. Standards for Criminal Justice (2d Ed. 1982) § 4-5.2, and commentary thereon (allocation of decision-making authority between defendant and counsel).

The speedy trial motion was filed with the trial court on March 4, 1991. Two days later, a hearing was held concerning the motion. At that time, the court noted that the motion "was effective on filing so it doesn't require a court order." See footnote 14. Although the defendant continued to be represented by counsel on these dates, the transcript also reflects that he had decided by that time to waive his right to counsel and to represent himself, and that the court was aware of his decision. The waiver occurred at the very next court date, less than three weeks later.

In light of these undisputed facts, to conclude that the defendant's speedy trial motion was ineffective for lack of standing would elevate form over substance. If the speedy trial motion had been denied as filed, the defendant could, and by all indications would, have renewed the motion once he was representing himself.

orandum to vacate the speedy trial order that specifically raised the standing question. Defense counsel could not present the motion on that date, however, because the defendant waived his right to counsel at that time. Since the underlying motion is part of the record before the court, and given the serious nature of the case and of the particular issue, we exercise our authority to review the claim.

On appeal, the defendant has not identified any prejudice that resulted from having his case set for the "on trial" list in early, rather than late, March, 1991. Therefore, whether we hold that the defendant's subsequent waiver of counsel ratified the prior speedy trial motion,[16] or whether we characterize the trial court's original decision as harmless error, is of no moment. The defendant's claim for reversal on the basis of the speedy trial motion must fail.

### III

The defendant's next claim, and the centerpiece of his argument on appeal, is the assertion that the trial court improperly denied the defense motion for a mistrial once the defendant had abandoned self-representation and counsel once again had been appointed to represent him. In this court, as in the trial court, the defendant raises numerous grounds in support of his position that a mistrial should have been declared.[17]

### A

As a threshold matter, we must decide what standard governs our review of the trial court's decision. This question arises because every issue cited in support of the contention that a mistrial should have been declared can be traced back, at least in part, to the defendant's personal decision to waive counsel and represent himself. We therefore must determine whether

---

[16] Because the waiver of counsel was constitutionally valid, we reject the defendant's argument that his subsequent request for reappointment of counsel voided any ratification of the speedy trial motion that had been effected by his waiver.

[17] The defendant's claim is that the mistrial was required as a matter of due process. Cf. *Faretta* v. *California*, supra, 422 U.S. 834–35 n.46 ("whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel' ").

a defendant, after a constitutionally adequate waiver of the right to counsel, may seek a new trial, once counsel is reappointed, because of prejudice arising from the defendant's own inadequate pro se performance. This is a question of first impression for this court.

The state urges us to adopt the position that a trial court never can order a mistrial at the defense's request when the errors or defects supporting the motion result from the defendant's own deficient attempt at self-representation. To allow a mistrial on that basis, the state argues, inevitably will encourage abuses by defendants that will prejudice the orderly process of justice. According to the state, if such mistrials are permitted, virtually every defendant facing serious charges will first elect to proceed pro se, relying on the hope that if he or she sufficiently mismanages the defense, the court will order a new trial at which counsel would not make the same mistakes. This process in turn would lead, at the very least, to added delay and expense imposed on an already overburdened court system. The state maintains that only a per se rule prohibiting mistrials in these circumstances can avoid the incentives leading to this untoward result. We are unpersuaded.

The state's position relies on two implicit premises of questionable validity. The first is its assumption that criminal defendants generally are animated by a desire to delay the ultimate adjudication of their guilt, and that they will elect self-representation to procure that delay. The facts of this very case, however, belie the universality of that proposition. It is undisputed that the defendant himself, over the objections of his own counsel, filed a speedy trial motion to accelerate his trial date. See part II of this opinion. The record of this case also reflects that one reason the defendant dismissed his attorneys, when they were first appointed to represent him, was their declared unwillingness to proceed directly to trial as he desired. At least in this

instance, therefore, a defendant facing the most serious of criminal charges was seeking a speedy resolution of the case, and his decision to represent himself was driven in part by a desire to expedite, rather than delay, his case.

The second premise underlying the state's position is its assumption that defendants are willing to risk the abandonment of possibly meritorious claims or defenses, as a result of their own inexperience, in the pursuit of delay. Otherwise, they would not forgo the assistance of counsel in a first trial when the chances of securing a mistrial were uncertain. We recognize that the federal courts indulge a similar hypothesis to deny review in habeas corpus proceedings of claims subject to state court procedural default rules. See *Wainwright* v. *Sykes*, 433 U.S. 72, 89, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (positing "sandbagging" as strategic choice underlying procedural defaults). The soundness of this proposition, however, has been seriously questioned. See id., 101–104 (Brennan, J., dissenting); E. Chemerinsky, Federal Jurisdiction (1989) § 15.5, p. 706. In any case, the presumptions governing federal collateral review of state criminal convictions involve a host of considerations that this case does not present.

As a general rule, the decision whether to declare a mistrial is committed to the sound discretion of the trial court. Practice Book § 887;[18] *State* v. *Wooten*, 227 Conn. 677, 693–94, 631 A.2d 271 (1993); *State* v. *Hill*, 201 Conn. 505, 510, 518 A.2d 388 (1986). We see no compelling reason to depart from this standard in the

---

[18] Practice Book § 887 provides in relevant part: "[PROCEEDINGS AT TRIAL——MISTRIAL] —— ——FOR PREJUDICE TO DEFENDANT

"Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case."

context of a criminal trial in which a defendant rethinks the decision to proceed pro se. Sound jurisprudential policy counsels against restricting the flexibility of the trial court to respond in the first instance to the particular circumstances of the case as it is being tried. To the extent that any defendant in fact is engaged in an effort to manipulate the trial process in the manner postulated by the state, the trial court will be able to respond appropriately.

## B

We therefore must address the defendant's challenge by determining whether the trial court in this case abused its discretion in denying the defendant's motion for a mistrial. Having thoroughly reviewed the transcript of the trial court proceedings, we conclude that the trial court's decision did not constitute an abuse of discretion.

While the remedy of a mistrial is permitted under the rules of practice, it is not favored. "[A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided." (Citations omitted; internal quotation marks omitted.) *State* v. *Wooten,* supra, 227 Conn. 693–94. On appeal, we hesitate to disturb a decision not to declare a mistrial. " 'The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome.' " *State* v. *Rodriguez,* 210 Conn. 315, 333, 554 A.2d 1080 (1989); *State* v. *Bausman,* 162 Conn. 308, 312, 294 A.2d 312 (1972). The trial court is better positioned than we are to evaluate in the first instance whether a certain occur-

rence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice.[19]

As a result, we have affirmed the denial of a mistrial motion under § 887 in numerous cases despite the occurrence of events arguably prejudicial to the defendant. See, e.g., *State* v. *Wooten*, supra, 227 Conn. 689–96 (improper in-court identification of defendant); *State* v. *Canty*, 223 Conn. 703, 720–22, 613 A.2d 1287 (1992) (improper prosecutorial comment on missing witnesses); *State* v. *Rodriguez*, supra, 210 Conn. 333 (juror approached by defendant out-of-court subsequently excused from panel before sworn and testified for state); *State* v. *Gaston*, 198 Conn. 490, 496, 503 A.2d 1157 (1986) (improper admission of evidence). Only in extraordinary circumstances have we overturned a trial court's denial of a mistrial under § 887. See, e.g., *State* v. *Hancich*, 200 Conn. 615, 626, 513 A.2d 638 (1986) (trial court, having told defendant he would have eight peremptory challenges, reduced number to four after defendant already had exercised four, and defendant testified that he would not have excused earlier jurors); *State* v. *Binet*, 192 Conn. 618, 625–34, 473 A.2d 1200 (1984) (deliberate prosecutorial misconduct); *State* v. *Ubaldi*, 190 Conn. 559, 564–75, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983) (same).[20]

The defendant in this case was not entitled to a mistrial simply on the basis of his attempt at, and then abandonment of, self-representation. Indeed, to a large

[19] Even if we assume, as the dissent does, that a special capital felony rule requires the application of a more rigorous standard of review to a trial court's denial of a mistrial motion; see pp. 862–63 of the dissenting opinion; such a rule surely would be confined to cases, unlike this one, in which the defendant actually was sentenced to death.

[20] Prosecutorial misconduct generates "prejudice to the judicial system as well as to the defendant," creating an added need to declare a mistrial to deter counsel and to "prevent such assaults on the integrity of the tribunal." *State* v. *Ubaldi*, supra, 190 Conn. 574–75.

extent, the defendant assumed the very risk when he elected to represent himself of which he now complains. As the trial court remarked when the defendant requested that counsel be reappointed, "I pointed out to you very early on in the proceedings that you would be attempting to perform your own brain surgery."

Nonetheless, even though prejudice to a defendant arises from his or her own conduct following a waiver of counsel, the specific events that transpired thereafter may require a court to order a mistrial. We therefore turn to the specific allegations of prejudice raised by the defendant in this case.

During the period when the defendant represented himself, he unsuccessfully argued motions to prohibit juror death qualification, to suppress his confession to agents of the FBI, and to change venue. In each instance, standby counsel was present for consultation or, in the alternative, to make the legal argument on the defendant's behalf if he so requested. In support of the motion to prohibit juror death qualification, defense counsel had, prior to the defendant's decision to proceed pro se, filed a detailed fifty-five page memorandum of law that remained before the court. For the motion to change venue, standby counsel, on order of the court, issued subpoenas and gathered evidence for purposes of demonstrating that pretrial publicity necessitated a transfer to ensure a fair trial. On the suppression issue, the court specifically invited counsel upon reappointment to introduce any other evidence relevant to the admissibility of the confession.

Furthermore, although the defendant cites his failures in arguing these motions as examples of prejudice arising from his pro se performance that required a declaration of mistrial, he does not explain why the trial court's decisions on the underlying motions were improper. This omission is particularly revealing, since

the defendant carries the burden of persuading us that sufficient prejudice existed from his self-representation that the trial court abused its discretion in denying his motion for a mistrial. At a minimum, such a showing in this context requires a demonstration that competent counsel could have prevailed on these motions. The defendant, however, has not even attempted to make this showing.

The defendant also conducted the full voir dire.[21] While the transcripts reflect that he may have exercised some of his peremptory challenges injudiciously, they also indicate that both the court and the state took pains to assure that a fair jury was impaneled. The court twice afforded the defendant an opportunity later to reconsider his prior acceptance of a prospective juror.[22] The defendant himself successfully challenged at least seven prospective jurors for cause. In at least one instance the *state* had a juror, otherwise accept-

[21] On appeal, the defendant places great emphasis on the prejudice arising from a situation in which he purportedly incriminated himself to a venireman who was accepted for the jury. The record does reflect that the defendant stated to this prospective juror that during the trial he would be shown a photograph "of a kid, a five year old kid I shot," and that this venireman initially was accepted for the jury. Before the trial began, however, this juror was excused by the court for personal reasons. We accordingly have no occasion to determine whether, had the juror actually been seated for the trial, a failure to grant a mistrial under the facts of this case would have constituted an abuse of discretion.

[22] In the first instance, the defendant had accepted the final venireman questioned on the first day of voir dire, apparently under the misapprehension that the phrase "one day, one trial" required that at least one juror be selected each day. On the following day, before any other prospective jurors were questioned, the court allowed the defendant to exercise a peremptory challenge to excuse that juror.

In the second instance, the defendant had accepted a juror whom, he subsequently learned, had been an FBI agent. Over the state's objection, the court again was going to permit the defendant to exercise a peremptory challenge retroactively to dismiss that juror. Following further reflection and both the state's and the court's observation that "the juror probably would be an excellent one," however, the defendant then decided not to excuse him.

able to it, excused for cause "to ensure," in the prosecutor's words, "that Mr. Day gets a fair trial." In total, over thirty prospective jurors were excused for cause on the grounds that they knew one of the victims, a victim's family member or other likely witnesses, that they had formed an opinion about the defendant's guilt from the media coverage of the incident, or other grounds of potential prejudice to the defendant.[23]

The defendant also personally cross-examined the four witnesses presented by the state during the first day of the trial. In one instance, the defendant's questioning elicited from Gloria S. that when she had asked two year old Marcus G. if the defendant was responsible for his injuries, he had responded: "Yes, Jason hurt me. Jason hurt me." In the mistrial motion before the trial court, defense counsel argued that, had they been representing the defendant during Gloria S.'s testimony, they "would have made a good faith effort to bar . . . those statements from becoming evidence in this case." Defense counsel does not suggest, however, that these statements actually would have been barred. See, e.g., *State* v. *Stange*, 212 Conn. 612, 617–20, 563 A.2d 681 (1989) (no error in admitting, under spontaneous utterance exception to hearsay rule, victim's answers to series of questions asked by police officer as long as thirty minutes after shooting by defendant), and authorities cited therein; *State* v. *Sharpe*, 195 Conn. 651, 664, 491 A.2d 345 (1985) (residual hearsay exception).[24] Moreover, while coun-

[23] Some eighteen other prospective jurors also were excused for cause for indicating that their opposition to the death penalty would preclude them from participating in a decision that would result in a sentence of death, even if it were legally appropriate.

[24] The record does not support the dissent's suggestion that Marcus G.'s statement "[does] not qualify as either spontaneous, unreflective or trustworthy." See p. 873 of the dissenting opinion. At the time, Marcus G. was a two year old boy who had just witnessed the murder of four people, includ-

sel argued that a mistrial was required because the prejudice caused by the statements could not adequately be remedied by a curative instruction, the record does not reflect that counsel requested such an instruction once the mistrial motion had been denied. Cf. *State* v. *Binet*, supra, 192 Conn. 632 ("[w]e have always given great weight to [curative] instructions in assessing claimed errors").

The defendant also relies on the speedy trial motion to demonstrate prejudice requiring a new trial. To the extent that this claim relates to the defendant's self-representation, there has been no showing that the defendant wanted to conduct any further preparation before going to trial, or that his failure to do so prejudiced his performance as counsel. The claim also fares no better with respect to the defendant's attorneys. They had nine months to prepare before the trial began. If that amount of time proved inadequate, the proper remedy was a continuance, not a mistrial. See part V of this opinion.

A pro se defendant's performance, in all likelihood, will be imperfect. That lack of professionalism does not suggest, however, that every pro se defendant who subsequently regrets the decision to waive counsel should be afforded a new trial. Indeed, the very reason a trial court must inform a prospective pro se defendant of the risks inherent in self-representation is that the

ing his mother. He also had been hit in his face hard enough to leave a bruise. The statement was made while Marcus G. was still at the apartment where the murders had occurred, an apartment that, according to photographs introduced at trial, was a gruesome scene. In light of these circumstances, Marcus G.'s statement cannot fairly be characterized as a carefully deliberative, calculated attempt to incriminate the defendant. This factual record also negates the dissent's recourse to a confrontation clause issue, a claim never raised by the defendant. Cf. *Ohio* v. *Roberts*, 448 U.S. 56, 65–66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980) (no confrontation clause violation when hearsay statement made under circumstances providing sufficient "indicia of reliability").

defendant may be required to accept his or her own errors. See Practice Book § 961 (4).

The trial court, which had the benefit of observing the proceedings firsthand, concluded that none of the alleged missteps in the defendant's odyssey into self-representation demonstrated sufficient irreparable prejudice to require a mistrial. "It bears emphasis that our review of this matter is governed by an abuse of discretion standard that, although not unreviewable, affords the trial court broad discretion . . . . Therefore, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently. Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives." (Citation omitted.) *State* v. *Hamilton*, supra, 228 Conn. 250. Although it might have been within the court's discretion to have granted a mistrial on this record, the court was not required to do so.

## IV

The defendant next challenges two rulings by the trial court during the voir dire, each of which, he maintains, deprived him of his right to a fair trial. The first claim relates to the trial court's purportedly improper denial of a challenge for cause. The second claim relates to the court's denial of additional peremptory challenges to the defendant once he had exhausted his allotment. We reject both claims.

## A

The claim relating to the for cause challenge concerns a prospective juror who was employed by the Superior Court as a law clerk, assigned to Waterbury, and who formerly had been an intern in the public defender's office. Through these experiences he was familiar with assistant state's attorney Jonathan Benedict, the pros-

ecutor, Holden, one of the defendant's lawyers, and a prosecution witness, Henry Lee, chief criminalist and director of the state police forensic laboratory, with whom he had spoken about forensic science. The record contains no suggestion that any of his contacts with these people in any way related to the pending case. Moreover, when asked if any of these acquaintances would make it difficult for him to sit as a juror, he responded: "I don't think so. I know as a juror you should sit down, listen to the facts as presented, and I believe I can do that fair and impartially." The defendant challenged this juror for cause on the basis of these connections, especially his prior conversations with Lee. After the court denied his challenge, the defendant exercised a peremptory challenge to excuse him.[25]

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." (Internal quotation marks omitted.) *Irvin* v. *Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *State* v. *Tucker*, 226 Conn. 618, 630, 629 A.2d 1067 (1993); *State* v. *Cubano*, 203 Conn. 81, 88, 523 A.2d 495 (1987); *State* v. *Ziel*, 197 Conn. 60, 64, 495 A.2d 1050 (1985). Primary responsibility for securing this guarantee rests with the trial court. See General Statutes § 54-82f (voir dire for cause challenges); Practice Book § 848. " '[T]he trial court is vested with wide discretion in determining the competency of jurors to serve, and that judgment will not be disturbed absent a showing of an abuse of discretion.' " *State* v. *Esposito*, 223 Conn. 299, 310, 613 A.2d 242 (1992); *State* v. *Cubano*, supra, 88–89.

---

[25] Because the defendant exhausted his supply of peremptory challenges before the end of voir dire, and additional challenges were sought and denied, he has standing to raise this claim on appeal, as the state concedes. See, e.g., *State* v. *Tucker*, 226 Conn. 618, 632, 629 A.2d 1067 (1993); *State* v. *Esposito*, 223 Conn. 299, 303, 613 A.2d 242 (1992).

The defendant has proffered no substantial evidence to support a claim that the trial court, in denying the for cause challenge, failed "zealously [to] protect [his] rights . . . ." *State* v. *Cubano*, supra, 203 Conn. 89, citing *Wainwright* v. *Witt*, 469 U.S. 412, 429–30, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). The prospective juror testified that, despite his acquaintance with officials involved in this case, he was capable of serving impartially, and the trial court credited his testimony. See *Johnson* v. *New Britain General Hospital*, 203 Conn. 570, 584–85, 525 A.2d 1319 (1987) (no abuse of discretion in not excusing juror who expressed general antagonism toward type of lawsuit but not toward particular party and who said it would not interfere with decision in particular case); cf. *State* v. *Esposito*, supra, 223 Conn. 311–12 (abuse of discretion not to excuse juror who expressed bias particularized toward defendant). It bears emphasis that, throughout the voir dire, the trial court demonstrated no reluctance to excuse jurors when necessary to secure a fair trial. Against this record, we are persuaded that the trial court did not abuse its discretion in this instance.

## B

The defendant's second claim relating to jury selection involves peremptory challenges. When the voir dire began, in accordance with the applicable state statute, the trial court informed each side that it would have thirty peremptory challenges. See General Statutes § 54-82h. As the voir dire progressed, the defendant made several requests for additional challenges, each of which was denied.[26] On appeal, the defendant asserts that the trial court abused its discretion in denying his requests. We disagree.

[26] The trial court informed the defendant, in denying his first request for additional challenges, "that on many, many occasions I have excused the juror without you ever making a request for cause or Mr. Benedict making a request for cause and this has all been done to ensure that you get as fair a trial as I can possibly arrange. I will continue to do that."

We begin with the recognition that peremptory challenges occupy a special position in this state's jurisprudence. The right to peremptory challenges is embodied in the text of article first, § 19, of the Connecticut constitution, as amended.[27] This constitutional provision " 'reflects the abiding belief of our citizenry that an impartial and fairly chosen jury is the cornerstone of our criminal justice system.' " *State* v. *Tucker*, supra, 226 Conn. 630; *State* v. *Hancich*, supra, 200 Conn. 625.

In accordance with constitutional mandate; see footnote 27; state statutes establish the minimum number of peremptory challenges to which a criminal defendant charged with a particular class of crime is entitled. See General Statutes §§ 54-82g and 54-82h. A trial court may allow the parties more peremptory challenges than provided by law. See, e.g., *State* v. *Crafts*, 226 Conn. 237, 260 n.16, 627 A.2d 877 (1993); *State* v. *Mercer*, 208 Conn. 52, 61, 544 A.2d 611 (1988); *State* v. *Miller*, 202 Conn. 463, 480, 522 A.2d 249 (1987); *State* v. *Hancich*, supra, 200 Conn. 626. We never have held, however, that a trial court's denial of a request for additional peremptory challenges, without more, constituted an abuse of discretion. See, e.g., *State* v. *Tucker*, supra, 226 Conn. 644 (no abuse of discretion); *State* v. *Marra*, 195 Conn. 421, 432, 489 A.2d 350 (1985) (no abuse in denying request for additional peremptory challenges "[a]bsent a showing that this ruling resulted in a jury that could not sit impartially on the defendant's case"); cf. *State* v. *Esposito*, supra, 223 Conn. 313 (grant of additional peremptories could have cured earlier error by court); *State* v. *Hancich*, supra, 626 (same).

---

[27] Article first, § 19, of the Connecticut constitution, as amended by article IV of the amendments, provides in relevant part: "In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. . . ."

In this case, the defendant has not demonstrated either that the trial court improperly denied any for cause challenges, or that the denial of his request for additional peremptories resulted in a biased jury. His argument, therefore, reduces to the proposition that he should have been granted extra challenges simply because he was representing himself. We are unpersuaded that a defendant's choice of self-representation suffices, as a matter of law, to require a trial court to grant additional peremptory challenges, and the defendant has cited no authority to support that proposition. We accordingly conclude that the trial court did not abuse its discretion in denying the defendant's request for additional peremptory challenges beyond those to which he was entitled under § 54-82h.

V

The defendant's next claim concerns his request for a continuance once the court had declined to declare a mistrial following the reappointment of counsel. In his written motion, the defendant had requested a sixty day continuance. At oral argument, he reduced the request to thirty days. The trial court granted a continuance for two weeks.[28] On appeal, the defendant argues that the court's failure to grant a continuance for the full thirty days requires reversal of his conviction because it impaired his right to effective and adequately prepared counsel. We disagree.

Trial courts are afforded broad discretion in matters of continuances. *State* v. *Hamilton*, supra, 228 Conn. 250; *State* v. *Aillon*, 202 Conn. 385, 394, 521 A.2d 555

---

[28] At that time, the court indicated to defense counsel that it would consider further continuance motions, as necessary, if the case were to proceed to a capital penalty phase. When the trial resumed after the two week continuance, the defendant renewed his previous request for a full thirty day continuance. That request again was denied. The penalty phase, however, did not commence until three months after the guilty verdicts were returned.

(1987). "To establish an abuse of discretion, the defendant must show that denial of the continuance demonstrably prejudiced his ability to defend himself." *State* v. *Aillon*, supra, 395; see *State* v. *Beckenbach*, 198 Conn. 43, 52, 501 A.2d 752 (1985). In this case, of course, a continuance was granted when counsel was reappointed at the defendant's request. The defendant's claim, therefore, is that he was entitled to a *longer* continuance than granted by the trial court.

In both this court and the trial court, the defendant cited the need to conduct research, investigation and various tests in support of his continuance motion, all of which had been suspended by counsel during the period of the defendant's self-representation. The trial court indicated that it had weighed these factors in determining the length of the continuance that it granted. Against these factors, the court also considered its interests in the orderly progress of the trial. Since the jury already had been impaneled and the state had begun to present its evidence, these considerations were of significant weight. See *State* v. *Hamilton*, supra, 228 Conn. 247; *State* v. *Beaulieu*, supra, 164 Conn. 627–28. While there is no evidence that the continuance was sought with the intent of delaying the proceedings, that fact alone is not controlling. *State* v. *Hamilton*, supra, 247 n.12; *State* v. *Beckenbach*, supra, 198 Conn. 50.

The defendant has not indicated any specific instances of prejudice resulting from the court's grant of a continuance for two weeks rather than one month. We therefore will not second-guess the trial court's determination of the appropriate duration for a continuance. See *State* v. *Hamilton*, supra, 228 Conn. 250. Accordingly, we hold that the trial court acted within its discretion.

## VI

The defendant's final claim concerns the "two witness" rule codified at General Statutes § 54-83, which provides that "[n]o person may be convicted of any crime punishable by death without the testimony of at least two witnesses, or that which is equivalent thereto." Although the defendant neither requested the trial court to charge on the statute nor excepted to the jury charge as given, he now claims that the court's failure to instruct the jury on the rule requires that his conviction be reversed. We disagree.

As we recognized in *State* v. *Ross*, 230 Conn. 183, 219, 646 A.2d 1318 (1994), cert. denied, U.S. , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), § 54-83 is a statutory enactment that prescribes the nature of the evidence that the state must adduce to prove its case. Unlike the reasonable doubt rule; *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (due process requires proof beyond reasonable doubt in criminal cases); *Summerville* v. *Warden*, 229 Conn. 397, 422–23, 641 A.2d 1356 (1994) (same); the evidentiary burden imposed by § 54-83 is not constitutionally compelled. See *State* v. *Ross*, supra, 219 (two witness rule is a "statutory" mandate).[29] Because § 54-83 does not add any substantive element to the crime to be proved, there is no due process requirement that the jury must be charged on the terms of the statute. Compare *State* v. *Leroy*, 232 Conn. 1, 7, 653 A.2d 161 (1995), and *State* v. *Ash*, 231 Conn. 484, 493, 651 A.2d 247 (1994)

---

[29] Although the defendant attempts to argue that the rule derives from article first, §§ 8 and 9, of the state constitution, his analysis of this claim involves nothing more than the bare assertion, contained in a single sentence, that the long-standing history of the statute makes it "incorporated in the state constitutional guarantees of due process and ordered liberty." This cursory briefing is insufficient to raise an independent state constitutional claim for review, and we therefore decline to address it. See *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992).

(constitutional right to proper charges on elements of crime). Accordingly, because the defendant's claim does not rise to constitutional magnitude, it does not qualify for review under the *"Evans-Golding"* doctrine. See *State* v. *Kulmac*, 230 Conn. 43, 74, 644 A.2d 887 (1994).

The defendant also asserts that his conviction must be reversed under the plain error doctrine. See Practice Book § 4185.[30] "A charge that demonstrates that the trial court has overlooked the applicable statute justifies consideration as plain error." *State* v. *Preyer*, 198 Conn. 190, 199, 502 A.2d 858 (1985); see also *State* v. *Hinckley*, 198 Conn. 77, 88, 502 A.2d 388 (1985); *State* v. *McCall*, 187 Conn. 73, 88, 444 A.2d 896 (1982). We will consider, under § 4185, a claim that the defendant was prejudiced by the trial court's failure to instruct the jury on a statute he contends is mandatory.

The defendant cannot prevail under § 4185, however, unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. We repeatedly have observed that plain error is not even implicated unless "the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Boles*, 223 Conn. 535, 551, 613 A.2d 770 (1992) (insufficient evidence to make court's failure to give accomplice charge plain error); *State* v. *Wright*, 207 Conn. 276, 288–89, 542 A.2d 299 (1988) (in context of plea found to be knowingly and voluntarily entered, court's failure to advise defendant of mandatory minimum sentence not plain error); *State* v. *Miller*, supra, 202 Conn. 469 (defective oaths to voir dire panel

---

[30] Practice Book § 4185 provides in relevant part: "ERRORS CONSIDERED

"The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court."

and petit jury not plain error); *State* v. *Hinckley*, supra, 198 Conn. 87–88 (inclusion of common law definitions of insanity with statutory definition in jury charge not plain error); cf. *State* v. *Yurch*, 229 Conn. 516, 523–24, 641 A.2d 1387, cert. denied, U.S. , 115 S. Ct. 430, 130 L. Ed. 2d 343 (1994) (failure to instruct on statute reviewed as plain error; conviction affirmed where failure was harmless). Moreover, because the claim raised here is nonconstitutional, the defendant must demonstrate that the trial court's improper action likely affected the result of his trial. *State* v. *Kulmac*, supra, 230 Conn. 74 n.19 (requiring, to prevail on plain error claim, that defendant, in addition to satisfying *Boles* standard, show that purported error more probably than not misled jury into improper conviction); *State* v. *Rinaldi*, 220 Conn. 345, 357, 599 A.2d 1 (1991); *State* v. *Flanders*, 214 Conn. 493, 502, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990).[31]

This court in the past has concluded that some jury instructions that improperly omitted reference to relevant statutory rights constituted plain error justifying reversal. See, e.g., *State* v. *Preyer*, supra, 198 Conn. 199 (failure to charge on General Statutes § 53a-67 [b], which provides affirmative defense of cohabitation to sexual assault charge); *State* v. *Burke*, 182 Conn. 330, 331–32, 438 A.2d 93 (1980) (failure to charge on General Statutes § 54-84, which requires instruction that

---

[31] Nothing in *State* v. *Yurch*, supra, 229 Conn. 516, is to the contrary. The test applied in that case to determine whether the defendant could prevail on his claim of plain error was functionally indistinguishable from the test we apply here. The phrasing we use today, moreover, emphasizes that the core of the plain error doctrine, like the *Golding* doctrine, concerns whether a defendant can prevail on the merits of a claim, not simply whether the claim can be reviewed. See, e.g., *State* v. *Kulmac*, supra, 230 Conn. 74 n.19; see also *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (establishing criteria to determine if defendant can prevail on unpreserved constitutional claim; final criterion is that claim would survive harmless error analysis).

jury may draw no adverse inference from defendant's failure to testify).[32] Those cases, however, turned on jurisprudential concerns not implicated here. In *Preyer*, for example, the defendant had established an evidentiary foundation supporting the defense on which the jury was misinstructed. We ordered a new trial, emphasizing "the seriousness with which we have viewed instructions that misinform the jury about the statutes that govern a criminal defense." *State* v. *Preyer*, supra, 199. Because § 54-83 pertains to the nature of the state's evidence, rather than to the establishment of a criminal defense, the concern raised in *Preyer* is inapposite here.

In this case, we conclude that, although the defendant had a statutory entitlement to an instruction on § 54-83; see *State* v. *Ross*, supra, 230 Conn. 219; the trial court's failure to charge on the statute did not result in manifest injustice. To begin with, the defendant's claim relates to an omission in the jury instructions, which is less likely to be prejudicial than is a misstatement of the law. *Henderson* v. *Kibbe*, 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977); *State* v. *Preyer*, supra, 198 Conn. 198. Furthermore, while colloquially referred to as the "two witness" rule, our cases establish that § 54-83 does not actually require the testimony of two eyewitnesses in order for the jury to convict in a death-eligible prosecution. *State* v. *Ross*, supra, 219; *State* v. *Malm*, 142 Conn. 113, 118–19, 111 A.2d 685 (1955); *State* v. *Taborsky*, 139 Conn. 475, 483–85, 95 A.2d 59 (1953). The statute, which explicitly allows the state to have recourse to "equivalent" evi-

---

[32] Because of the constitutional underpinnings of § 54-84; see, e.g., *State* v. *Sinclair*, 197 Conn. 574, 582–83, 500 A.2d 539 (1985) (failure to charge on § 54-84 infringes right against self-representation); our decision in *Burke* more properly should be understood in light of our rule permitting review of unpreserved constitutional claims rather than the plain error doctrine. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 829 (1989) (clarifying doctrine of *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 [1973]).

dence, is satisfied when, in addition to the testimony of a witness, the state introduces circumstantial evidence from which the jury may infer the defendant's guilt. *State* v. *Ross*, supra, 219.

In presenting its case, the state introduced autopsy reports for the victims that attributed their deaths to gunshot wounds to the head. Agents of the FBI testified that the defendant had confessed to the murders. Gloria S. testified that, two weeks before the murders, the defendant had threatened to kill everyone living in the apartment if Lisa G. attempted to leave him. The defendant's fingerprints were found on the handle of the shovel used to bludgeon Theresa H. From the car that the defendant admitted driving to the hospital in New York, the police recovered a gun, belonging to Raymond G., which the defendant had been seen to handle on many prior occasions. Ballistics tests demonstrated that the eight shell casings recovered from the murder scene had been fired by that gun.

In light of the overwhelming direct and circumstantial evidence corroborating the defendant's confession, we are persuaded that the defendant cannot meet his burden. Accordingly, since it is not more likely than not that the trial court's failure to instruct on § 54-83 affected the verdict, the defendant cannot prevail on his claim of plain error.

## VII

Although we affirm the judgment of conviction in this case, the proceedings in the trial court also have convinced us of the need for a reexamination of the role of standby counsel. Our rules of criminal procedure, as currently written, provide an extremely limited role for standby counsel. See Practice Book §§ 962 through

964.[33] We no longer are persuaded that the circumscribed role contemplated by the rules of practice comports with the interests of justice.[34]

At the outset, we locate our concerns within the general constitutional landscape. As the dissenters in *Faretta* v. *California*, supra, 422 U.S. 836, stressed, the state has an independent interest in the reliability of criminal verdicts that transcends its role as an adversary. "Although we have adopted an adversary system of criminal justice . . . the prosecution is more than an ordinary litigant, and the trial judge is not simply an automaton who insures that technical rules are adhered to. Both are charged with the duty of insuring that justice, in the broadest sense of the term, is achieved in every criminal trial." (Citation omitted.) Id., 839 (Burger, C. J., dissenting); see also id., 849 (Blackmun, J., dissenting) ("the interest of the [s]tate in a criminal prosecution 'is not that it shall win a case, but that justice shall be done' ").

---

[33] Practice Book § 963 provides: "[RIGHT TO COUNSEL —STANDBY COUNSEL FOR DEFENDANT REPRESENTING HIMSELF] — —APPOINTMENT

"When a defendant has been permitted to proceed without the assistance of counsel, the judicial authority may appoint standby counsel, especially in cases expected to be long or complicated or in which there are multiple defendants."

Practice Book § 964 provides: "[RIGHT TO COUNSEL —STANDBY COUNSEL FOR DEFENDANT REPRESENTING HIMSELF] — —ROLE

"If requested to do so by the defendant, the standby counsel shall assist the defendant. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request."

[34] We do not mean to suggest that the current rules in any way infringed the defendant's constitutional rights. Standby counsel enters a criminal proceeding only once the right to counsel has been validly waived. As we already have discussed, the defendant effected such a waiver at the time he elected to represent himself. See part I of this opinion. Our concern here, rather, rests with the societal interests discussed more fully in the body of the opinion.

In the view of the dissenters in *Faretta*, self-representation was incompatible with this state interest. See id., 839 (Burger, C. J., dissenting) (interest "is ill-served, and the integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel"); id., 849 (Blackmun, J., dissenting) ("I do not believe that any amount of pro se pleading can cure the injury to society of an unjust result"). The *Faretta* majority responded to this concern by recognizing the right of a state, even over the defendant's objection, to appoint standby counsel. Id., 834–35 n.46. The role contemplated by the *Faretta* majority, however, appeared quite limited. Standby counsel was "to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." Id. The same limited conception of the role is embodied in our Practice Book. See footnote 33.

Subsequent case law has recognized, however, that standby counsel can serve a more active role and exercise a larger degree of independent initiative without infringing the right to self-representation. "The pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle* v. *Wiggins*, supra, 465 U.S. 174. The United States Supreme Court has clarified, nonetheless, that actions by standby counsel that do not amount to limitations on the pro se defendant's own actions are permissible. "[N]o absolute bar on standby counsel's unsolicited participation is appropriate or was intended. . . . In determining whether a defendant's *Faretta* rights have been respected, the primary focus must be on whether the

defendant had a fair chance to present his case in his own way. *Faretta* itself dealt with the defendant's affirmative right to participate, not with the limits on standby counsel's additional involvement." Id., 176–77.

In striking the balance between the pro se defendant's rights and the permissible role of standby counsel, the United States Supreme Court articulated two overarching principles. "First, the pro se defendant is entitled to preserve actual control over the case he chooses to present to the jury. . . . Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." Id., 178. The court also recognized that the weight to be accorded the competing concerns of the pro se defendant's autonomy, on the one hand, and standby counsel's position as supplemental guarantor both of the defendant's rights and of the integrity of the trial process, on the other, depended in part on whether standby counsel's activities occurred in the presence of the jury. Id., 179; see also id., 179–85 (whether defendant consented to standby counsel's conduct, and whether disagreements between standby counsel and pro se defendant are resolved in defendant's favor whenever matter normally would be left to discretion of counsel).

We need not explore in detail the specific holdings of the *McKaskle* decision. For our purposes here, it suffices to recognize that the United States Supreme Court has sanctioned a definition of the role of standby counsel that significantly exceeds the limits imposed by Practice Book § 964. Exercising our inherent authority to safeguard the administration of justice in this state, we urge the standing committee on rules to consider the formulation of new standards that provide for

a more active role for standby counsel, consistent with the relevant constitutional principles articulated in this opinion.

The judgment of the trial court is affirmed.

In this opinion CALLAHAN, KATZ and PALMER, Js., concurred.

BERDON, J., dissenting. I disagree with much of the majority's analysis in this capital murder case, in which the state sought the death penalty for the defendant, Jason Day. Nevertheless, I reach only one issue. In my view, the defendant's conviction must be reversed and a new trial ordered because the trial court failed to grant the defendant's motion for a mistrial.

I

Before embarking on an analysis of the precise legal issues involved, it is helpful to begin with a more thorough understanding of the procedural background of the case and of the factual circumstances that led up to the defendant's motion for mistrial.

The defendant initially was taken into police custody on March 23, 1990, when he was arrested in Maryland on suspicion of committing multiple murders in Connecticut.[1] The murder victims included the defendant's girlfriend and a five year old boy who had lived in their apartment. Federal authorities returned the defendant to this state on June 7, 1990. The defendant subsequently was charged in Connecticut with one count of capital felony in violation of General Statutes § 53a-54b (8), four counts of murder in violation of General Statutes § 53a-54a (a) and one count of assault in the third degree in violation of General Statutes

---

[1] The defendant was arrested by federal agents on a charge of unlawful flight in violation of 18 U.S.C. § 1073.

§ 53a-61 (a) (1). Two attorneys from the public defender's office were assigned to represent the defendant, who was unable to afford a private attorney.

The defendant was incarcerated prior to trial under conditions that were very oppressive. Because of the nature of the crimes of which the defendant was accused, many inmates threatened him and repeatedly warned prison officials that the defendant's safety was in danger. The state department of correction continually shuffled the defendant between prisons in an attempt to keep him safe. The deputy warden at the correctional center at Cheshire testified that "there were many, many uprisings [in response to the defendant's presence]. In fact, when he came through one of the blocks, the [inmates housed in the] blocks started ranting and raving and screaming against him." When he was at Cheshire, prison officials housed him in a separate cell, apart from the other inmates, and he was not allowed to mingle with the other prisoners. At times when it was necessary for the defendant to leave his cell, two prison officials would escort him in order to assure his safety.

After the defendant had been incarcerated under these conditions for nearly one year, he filed a pro se motion for a speedy trial pursuant to General Statutes § 54-82m and Practice Book § 956B.[2] His attorneys were not aware that he was planning to file such a motion and, at the hearing on the motion, they advised the court that they were not prepared to go forward with his trial. Indeed, the state had not completed providing this defendant with discovery at this time. The defendant, however, reminded the court that he had been incarcerated for almost one year, and that "because of my position being incarcerated right now, that I chose, myself, being that it is my life that we're

---

[2] See footnote 14 of the majority opinion.

speaking about, to file a speedy trial motion, because . . . it is my heart's desire to go ahead with this . . . . [I]f the state has a case, in effect, a jury should decide that the state's case is equivalent to the accusations, then I guess I'll have to settle for the punishment and that is all well and clear in my mind at this time." The trial court held that the defendant's motion had effectively triggered the statutory speedy trial mechanism and, therefore, ordered that the defendant be brought to trial within thirty days.

Two weeks later, after being declared competent to stand trial, the defendant asked the court on March 26, 1991, to allow him to represent himself and to discharge the two public defenders assigned to represent him. At a hearing on this motion that same day, the defendant explained why he had filed the motion. "[It is] not that I felt they couldn't do the job, it is just that at the time I am ready to have this issue dealt with, they felt that they are not ready or adequate. So I asked the question, if I wait are you guaranteeing me a win, [and they answered] no we are not, then what is the sense in me waiting if it is not to be. I will do it now and if I have to do it myself then so be it." At this same hearing, however, the defendant indicated his distrust of the public defenders and his hope that he could contact a private attorney to help represent him. "[I]f I got in touch with someone in time, probably by—at least by the time that my jury was picked, maybe I could have someone to come in as standby counsel that will represent me and could possibly file an appearance on my behalf but not to speak with me but just that I can confer with him to make sure that my rights are not being denied or violated while the trial is taking place. . . . I think that I would be just a biggest fool as to put my life in the hands of attorneys who are appointed by the state against the state, I think one hand washes the other and regardless of what the situation may be, that is my situation."

The trial court found that the defendant was competent to waive his constitutional right to counsel and that he had, in fact, effectively waived this right. In accordance with the defendant's request, therefore, the trial court appointed the public defenders as standby counsel[3] and allowed the defendant to represent himself. That same day, the defendant argued a motion that had been prepared earlier by the public defenders. The following day, the defendant, who had never before been to trial, began to select the jury.

The defendant served as his own counsel for only two days, including the first day of jury selection, before having second thoughts. On Thursday, March 28, 1991, one of the public defenders appointed as standby counsel informed the court that the defendant "has realized during the course of yesterday's proceedings that his inexperience in courtroom matters, particularly jury selection, and his lack of knowledge regarding legal proceedings places him at a disadvantage in the selection of the jury and so he feels that he should not proceed any further on his own and wishes to have this continuance so that he could have the opportunity to attempt to obtain private counsel over the weekend, Your Honor." The trial court granted a continuance until the following Monday so that the defendant could seek out private counsel. The defendant, however, failed to obtain private counsel and continued to represent himself after the weekend.

---

[3] Practice Book § 963 provides: "When a defendant has been permitted to proceed without the assistance of counsel, the judicial authority may appoint standby counsel, especially in cases expected to be long or complicated or in which there are multiple defendants."

The trial court formally appointed only one public defender, Patrick J. Culligan, as standby counsel for the defendant after he elected to represent himself. The transcripts and the record indicate, however, that another public defender, William Holden, appeared at trial with Culligan and also assisted the defendant. Moreover, Culligan's comments to the trial court indicate that both he and Holden were assisting the defendant during this time. Accordingly, I refer to both Culligan and Holden as standby counsel.

In all, the defendant argued motions that had previously been filed by his court-appointed attorneys, conducted the entire jury selection and, during the first day of the presentation of evidence, cross-examined four prosecution witnesses. On the second day of the presentation of evidence, the defendant decided that he could not adequately represent himself, and the court reappointed standby counsel as his attorneys. They immediately moved the court to declare a mistrial, and they filed a detailed written motion setting forth their specific grounds.[4] The trial court, however, denied the motion.

---

[4] The motion for mistrial filed by the defendant's attorneys read as follows:

"MOTION FOR MISTRIAL

"Pursuant to Practice Book § 887 the defendant respectfully requests that the Court declare a mistrial in the trial of the instant case. The defendant asserts that a mistrial is required because of events which have transpired both inside and outside of [the] courtroom which have resulted in substantial and irreparable prejudice to the defendant's case.

"In support of his motion the defendant states the following:

"1. On March 6, 1991, the Court granted the defendant's pro se motion for a speedy trial over the objection of the defendant's attorneys who informed the Court that they were not prepared to proceed to trial;

"2. On March 26, 1991, the Court granted the defendant's motion to proceed as a pro se defendant and appointed the defendant's former attorneys as standby counsel pursuant to [Practice Book] § 962;

"3. The defendant engaged in jury selection and a 'death-qualified' jury was empaneled.

"a. [The] Defendant's present attorneys did not voir dire any of the jurors.

"b. Certain veniremen who expressed reservations about their ability to participate in a proceeding and to render a decision which would result in the defendant receiving a death sentence were excused by the Court without sufficient questioning concerning their willingness to follow their oaths and juror's duties.

"c. The defendant expended his allotted 30 peremptory challenges before the fifth juror was chosen and the Court denied the defendant's request for additional peremptory challenges.

"4. The defendant argued a Motion for Change of Venue which was denied by the Court.

"a. The defendant did not have the opportunity to conduct a public opinion survey;

"b. The defendant did not introduce any media circulation, broadcast range and viewer population data;

## II

I agree with the majority that, as a general rule, the decision whether to declare a mistrial lies in the sound discretion of the trial court. *State* v. *Hill*, 201 Conn.

"c. Due to this lack of information, the defendant did not have the ability to demonstrate that some other judicial district venue would provide a more neutral forum for the trial.

"5. The defendant argued a Motion to Suppress his statements to certain FBI officials which was denied by the Court.

"a. The defendant did not address the issue of the voluntary waiver of his Miranda rights during the presentation of evidence and argument.

"b. The State did not honor the standing discovery order to disclose admissions of the defendant prior to the hearing in that the State had not disclosed the contents of the defendant's telephone call to Elvira Pierce which was testified to by special agent Richard Hoskins. This issue was not addressed by the defendant.

"6. The Court granted the State's Motion for Production of Nontestimonial Evidence and the defendant subsequently refused to comply with the Court's order. The defendant's present attorneys were not able to advise and request him to comply with the Court's order because of their status as stand-by counsel, which prohibits the giving of unsolicited advice.

"7. The State presented four witnesses on the first day of trial while the defendant was still proceeding pro se.

"a. The defendant did not confer with stand-by counsel before conducting cross-examination of the witnesses.

"b. The defendant elicited several very prejudicial statements from witness Gloria [S.] during cross-examination. [Gloria S.'] cross-examination testimony concerning the alleged statement of the two-year-old victim, [Marcus G.], wherein he accused the defendant of hurting him was only placed in evidence as the result of the defendant's cross-examination as it had not been the subject of [Gloria S.'] direct testimony in any manner or fashion.

"8. The defendant's attorneys stopped all preparation for trial on March 26, 1991, when the defendant elected to proceed pro se.

"a. Discovery was not complete as of March 26, 1991, in that the State continued to supply the defendant with discovery after March 26, 1991.

"b. The defendant's attorneys have not reviewed and analyzed any of the discovery materials submitted by the State to the defendant after March 26, 1991.

"9. The defendant has repeatedly stated that one of his reasons for electing to proceed pro se was his disagreement with defense counsel concerning appropriate trial strategy. Since March 6, 1991, when the defendant

505, 510, 518 A.2d 388 (1986); *State* v. *Peary*, 176 Conn. 170, 172, 405 A.2d 626 (1978), cert. denied, 441 U.S. 966, 99 S. Ct. 2417, 60 L. Ed. 2d 1072 (1979). The trial court's discretion, however, is not unlimited in this regard. Rather, the trial court must grant a defendant's motion for mistrial when "it is apparent to the court that because of some occurrence upon trial the accused cannot have a fair trial and the whole proceedings are vitiated. *State* v. *Hafner*, 168 Conn. 230, 245–46, 362 A.2d 925 [cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975)]." *State* v. *Peary*, supra, 172–73; *State* v. *Wallace*, 181 Conn. 237, 243, 435 A.2d 20 (1980). Similarly, the trial court should grant a defendant's motion for mistrial when the occurrence "results in substantial and irreparable prejudice to the defendant's case." *State* v. *DeFreitas*, 179 Conn. 431, 460, 426 A.2d 799 (1980).

Moreover, in a case where the state is seeking the death penalty against a defendant, I believe that the trial court's range of permissible discretion must be construed more narrowly. The trial court's decision at

requested a speedy trial until today, the defendant and defense counsel have not agreed upon trial strategy.

"10. The defendant submitted a list of defense witnesses to the Court on the opening day of trial for the purpose of requesting the Court's assistance in having the witnesses subpoenaed to testify in his behalf.

"a. Because of his indigency and because he is incarcerated in lieu of bond, the defendant requested the assistance of the Court to subpoena his witnesses.

"b. The State was given a copy of the defendant's witness list by the Court.

"c. The Court did not inquire of the defendant if the defendant wished to divulge his witness list to the State.

"d. Pursuant to the rules of practice, the defendant was under no obligation to divulge his list of proposed witnesses to the State.

"The defendant asserts that the above-described events individually and in their totality constitute events and conduct which have created substantial and irreparable prejudice to his case. The defendant urges that the Court declare a mistrial, discharge the jury and return the defendant's capital felony prosecution to the jury list to await his trial in the normal course of docketing."

that moment—whether to declare a mistrial and start again, or to continue forward in the same trial—has the potential to determine whether the defendant lives or dies.[5] "Death penalty cases are different from all other cases. The punishment is final. If it is wrong, it cannot be corrected; it cannot be undone; it cannot be made right. And so, we [must] review this case with the utmost care and detail for the purpose of assuring ourselves that we do not impose the death penalty unlawfully, arbitrarily, or unjustly by slavish adherence to doubtful application of technical doctrine." *Engberg v. Meyer*, 820 P.2d 70, 86 (Wyo. 1991).

Applying this stricter standard to this capital felony case, I conclude that the trial court was required to grant the defendant's motion for a mistrial for two reasons: (1) the defendant had not been competent to

---

[5] For two reasons, I disagree with the majority's assertion that, even if the trial court's discretion is narrower in death penalty cases, we should apply that stricter standard upon review only if the defendant ultimately was sentenced to death. See footnote 19 of the majority opinion. First, upon appellate review, we should consider the trial court's decision whether to grant the motion for mistrial as a moment frozen in time. At that moment, the state is attempting to have the defendant put to death, and the defendant is moving the court to declare a mistrial and start afresh. The trial court's denial of the defendant's motion at that moment tips the scale in favor of the state's attempt to put him to death. For this reason, I believe that we must review the decision of the trial court without regard to whether the defendant, at some later point, was saved from a punishment of death.

Second, but equally important, the majority's position disregards the fact that even if a capital defendant's life is spared during the sentencing phase, the mere conviction of a capital felony means that he will face a sentence that is fundamentally different than that imposed on other criminal defendants in this state. A sentence of "life imprisonment" means a definite sentence of sixty years in prison. General Statutes § 53a-35b. A person so sentenced may be released on parole before the expiration of the sixty years. General Statutes § 54-125a (a). In capital felony cases, however, a defendant who is spared the death penalty is required by statute to be sentenced to spend the rest of his natural life in prison without the possibility of release. General Statutes §§ 53a-35a (1), 53a-35b and 54-125a (b). Thus, even if a capital defendant's life is spared during the sentencing phase, he will be deprived of any opportunity for release.

decide to represent himself at the beginning of the trial; and (2) the defendant's "odyssey into self-representation," as the majority phrases it, had unavoidably affected the remainder of his trial, resulting in substantial and irreparable prejudice to his case. See *State* v. *DeFreitas*, supra, 179 Conn. 460. I shall discuss these points in turn.

## A

I disagree with the majority's narrow approach to the issue of the defendant's competency. The majority considers his competency only in the context of whether he could have waived his federal constitutional right to counsel and chosen to represent himself. In my view, however, we must also consider the defendant's competency when reviewing the trial court's refusal to grant a mistrial after the defendant had relinquished the reins of self representation and had accepted the services of court-appointed attorneys. Moreover, I believe that our capacity to consider the defendant's competency at this latter stage is not proscribed by any federal constitutional rule.

At the outset, I agree with the majority that, in reviewing whether a trial court properly allowed a defendant to waive his federal constitutional right to counsel and to represent himself, we are bound by the decision of the United States Supreme Court in *Godinez* v. *Moran*, 509 U.S. 389, 398–99, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993). That decision holds that a state must apply the same test of competency to whether a defendant may waive his right to counsel as it does to whether a defendant may stand trial. Id., 398. Because this state determines a person's competence to stand trial by asking whether he is able to understand the proceedings against him and to assist in his own defense; General Statutes § 54-56d (a);[6] we

---

[6] See footnote 10 of the majority opinion.

must apply that same standard in determining whether the trial court should have granted or denied the defendant's motion to represent himself.

The rule of *Godinez,* however, does not prohibit us from taking into consideration a defendant's degree of competence *later* in the proceedings, after he has come to his senses and is willing to allow an attorney to represent him. As Justice Blackmun pointed out in his dissent in *Godinez,* the law always has "recognized that a defendant's mental condition may be relevant to more than one legal issue, each governed by distinct rules reflecting quite different policies." (Internal quotation marks omitted.) *Godinez* v. *Moran,* supra, 509 U.S. 413. Indeed, once the defendant has realized that he cannot and should not represent himself, the federal constitutional constraints of the *Godinez* rule vanish. As the majority aptly points out, that rule exists because "[a]pplication of a stricter competency test in the [waiver of counsel] analysis than was used in the [competency to stand trial analysis] would place an unconstitutional burden on the exercise of the defendant's federal constitutional right to self-representation." Once the defendant relinquishes the reins of self-representation and counsel is reappointed for him, however, we need no longer concern ourselves with burdening that right. Therefore, without regard to whether the defendant was competent to stand trial, the trial court should have taken into account the defendant's actual degree of competency in determining whether justice required that a mistrial be granted.

The record in this case clearly reveals that, although the defendant may have been competent to stand trial, he surely was not competent to decide whether to represent himself. Charles A. Opsahl, a clinical psychologist and assistant clinical professor at Yale Medical School, conducted both psychological and neuro-

psychological testing on the defendant.[7] Opsahl testified that it was "clear" that the defendant suffered from brain damage due to head injuries or accidents that he had sustained in the past. He further testified that the defendant "suffers from a delusional disorder marked by paranoid delusions and also grandiose delusions. And by that I mean that he is, in those areas, not in touch with reality. He at times believes that he is being persecuted, that people are out to kill him, that he has to be guarded to protect himself and [should not] say too much, and also has some grandiose delusions, that is, that he is more powerful than he really is, that he has special connections with certain people in a grandiose fashion, that is, again, not in touch with reality or the way things really are." Opsahl concluded that the defendant, who had a full scale IQ of 79, had a degree of intelligence that bordered on mental retardation.

Furthermore, given this psychological and neuropsychological profile of the defendant, it is easy both to discern the steps that led up to his decision to represent himself and to understand that he did not make this decision competently or voluntarily, as we understand those terms. He had been incarcerated for nearly one year under oppressive prison conditions. His fellow inmates screamed at him and threatened his life, and he had to be locked in a separate cell for his own protection. Such an environment, the equivalent of solitary confinement, could be devastating even for a person without the defendant's psychological problems.

[7] Opsahl explained the difference between these two types of analysis. "Neuropsychological testing involves attempting to evaluate possible brain injuries, difficulties in behavior or thinking that people might have as a result of head injuries, for instance, sustained in motor vehicle accidents, head injuries sustained in fights or in falls. . . . Psychological testing, on the other hand, is more concerned with the area of personality problems, personality functioning, psychological issues or problems which do not have a basis for which are not caused by brain injuries per se, body injuries."

Moreover, the defendant's only source of help—his attorneys—had been appointed by the same state that was prosecuting him for his alleged crimes. These attorneys repeatedly told him, even after he had been in prison for one year, that they were not ready to represent him or to go to trial. With these pressures on the defendant, it is understandable from his perspective why he opted for a speedy trial, which in turn triggered his decision to waive the right to counsel and to represent himself. On the basis of this record, the trial court should have granted the defendant's motion for a mistrial.

## B

Moreover, the trial court should have granted the defendant's motion for a mistrial on the basis of what had occurred during the time that the defendant represented himself. Indeed, although the defendant represented himself only through the first day of the presentation of evidence, it is apparent from the record that his attempts at jury selection and cross-examination were total disasters that irreparably affected the remainder of his trial and prejudiced his defense.

The defendant's use of peremptory challenges obviously was not informed. He accepted one individual as a juror without asking any questions whatsoever, because he was under the mistaken impression that he was required to accept at least one prospective juror per day.[8] Moreover, although the defendant had been

---

[8] The defendant had heard the phrase "one day, one trial," and misconstrued this to mean that he was obligated to select at least *one juror* during *each day* of jury selection. Thus, at the end of the first day of jury selection, when the defendant had not yet selected any jurors, he accepted the day's final prospective juror without asking a single question. The following day, when the defendant's standby counsel explained the misunderstanding to the court, the prosecutor indicated that he had no objection to allowing the defendant to reexamine the chosen juror. The defendant did so, and used a peremptory challenge to disqualify the juror.

allotted thirty peremptory challenges, he had exhausted his allotment before even the fifth juror had been selected, and the trial court denied his request for additional peremptory challenges. In effect, the defendant's ignorance of the proper and strategic use of the peremptory challenge prohibited him from rejecting more than one half of his eventual jurors for any reason other than cause. This ignorance of the selection procedures obviously was prejudicial to his defense. Indeed, as the majority points out, the prosecutor, in the interest of justice, agreed at one point to dismiss an obviously state oriented juror for cause because the defendant had no more peremptory challenges he could exercise.

Standby counsel offered little or no help to the defendant during this phase of the proceedings. Their involvement was so limited that the prosecutor, concerned that this was a capital felony prosecution for which the state was seeking the death penalty, asked the court to require them to take a more active role and to assist the defendant in the jury selection. The prosecutor stated that "[w]hat we are doing is we are prosecuting somebody for a crime that has occurred in the city of Bridgeport and *it is the state's position that what has happened thus far is inadequate and inappropriate and I would ask that the court enter orders seeing that Mr. Day receives continuing and more active legal representation.*"[9] (Emphasis added.) Indeed, by

---

[9] The entire remarks of the prosecutor, assistant state's attorney Jonathan Benedict, were as follows: "I don't want either the court or Mr. Day or counsel to get the impression that the state is in a rush about this, because we are not, we are certainly willing to stand by and wait for all the time it takes for the defense to accurately defend Mr. Day.

"In view of the seriousness of the charge and the possible punishment in this case where I think there is concern that Mr. Day receive a fair trial as any other party of this courtroom, however, I think perhaps now is—we are at the point—because the state is confused and I think obviously Mr.

calling his concerns to the attention of the trial court, the prosecutor was acting in the highest traditions of the profession. See Rules of Professional Conduct 3.8, comment ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice . . . .").

Despite the remarks of the prosecutor, however, the defendant's attorneys indicated that they remained unprepared to assist him, just as they had been when he had filed his pro se motion for a speedy trial. One of the public defenders informed the court that "[w]e are not any more prepared today to provide him with effective representation than we were three weeks ago

---

Day is confused and his counsel also are confused as to exactly what is the nature of any legal representation Mr. Day has.

"I think that while the public defender's office may have one opinion as to what that type of a representation should be, I think that is something that at this point should be determined by the court and I think it should be determined with—obviously in view and the nature of the charges and the possible punishment in this case, and I think in an attitude that all we have to do under these circumstances is sit back and let him represent himself is inappropriate and the longer we do this would not be at all fruitful no matter what the outcome of the case is.

"I think at this point it is appropriate that as Mr. Day continues to insist on representing himself, that nevertheless the public defender's office has been appointed previously, and for a long time, to defend Mr. Day in this case and I think that their efforts from this point on should be more than mere standby and will answer questions if he has questions. It is rather apparent that he does not have either the funds nor the freedom or the time to do all that has to be done for him in his defense. He has two lawyers, one sitting on either side of him as he has had for three or four weeks during the pendency of this trial.

"I think it is appropriate from this point on that the defense be somewhat more active no matter what the public defender's office thinks that their appropriate stance be. What we are doing is we are prosecuting somebody for a crime that has occurred in the city of Bridgeport and it is the state's position that what has happened thus far is inadequate and inappropriate and I would ask that the court enter orders seeing that Mr. Day receives continuing and more active legal representation."

and the fact that we have now been appointed standby counsel has not somehow made us more prepared." Furthermore, they indicated that they interpreted Connecticut law to require them to take such a limited role.[10] Indeed, the attorneys took exception to the trial court's order for them to issue subpoenas on behalf of the defendant, on the basis that they were not the attorneys of record for the defendant and did not have appearances in the file.

The defendant's attempt at cross-examination also was devastating. One of the four witnesses called by the state on that first day of the presentation of evidence was Gloria S., who shared an apartment with the defendant and the victims and who had discovered three of the bodies. During the defendant's cross-examination of her, she responded with several outbursts. Amid questioning from the defendant in front of the jury, her responses at various times included "Oh God! Help me!" and "I can't take this!" She also called the defendant a "son of a bitch!" At no time did the defendant or his standby counsel request, nor did the court on its own give, a cautionary instruction to the jury that it should disregard the outbursts.

Moreover, the defendant elicited damaging statements from Gloria S. during cross-examination. She had testified on direct examination that, upon finding the bodies, she also discovered Marcus G., the two year old son of one of the victims who appeared to have a bruise on his face but was otherwise unhurt. The defendant elicited on cross-examination that Gloria S. had asked Marcus what had happened. "I asked

---

[10] Practice Book § 964 provides: "If requested to do so by the defendant, the standby counsel shall assist the defendant. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request."

Marcus, I said, 'Marcus, what happened? Did Marty do this to you?' I know Marty is already dead. He said, 'Yes, Marty do this to me.' I said, 'Did Jason [the defendant] do this to you?' He said, 'Yes, Jason hurt me.' " Such a statement, which clearly implicated the defendant, certainly was prejudicial to the defendant's case. Nevertheless, the majority passes off this hearsay testimony as not being prejudicial because "[d]efense counsel does not suggest . . . that these statements actually would have been barred." In support of its summary analysis of this issue, the majority suggests that the testimony might fit the "spontaneous utterance" exception to the rule against hearsay or the residual, catchall exception to the rule.

I disagree with this analysis of whether the statements were prejudicial to the defendant for two reasons. First, the issue of whether the hearsay statements of the child would have been admissible is wholly separate and distinct from the issue of whether the defendant was prejudiced by his own attempts at self-representation. Ordinarily, we consider the admissibility of hearsay in the context of the state's attempt to introduce hearsay statements into evidence over the timely objection of the defendant. In this case, however, the statements were not introduced by the state. Indeed, the state probably did not attempt to do so because it recognized that these statements would not be admissible under our rules of evidence. Rather, these statements were repeated in front of the jury solely because of the ineptitude of the defendant in acting as his own attorney. As such, an analysis that hinges on the admissibility of the statements is inappropriate.

Second, the majority's suggestion that these statements of the child would nevertheless be admissible over proper objection stands two recognized hearsay exceptions on their heads and implicates the confrontation clauses of the United States constitution and our

own state constitution. In determining whether a hearsay statement is admissible as a spontaneous utterance, "[t]he ultimate question is whether the utterance was spontaneous and unreflective and made under such circumstances as to indicate absence of opportunity for contrivance and misrepresentation." *Cascella* v. *Jay James Camera Shop, Inc.*, 147 Conn. 337, 342, 160 A.2d 899 (1960). A "mere [recital] of a past event"; id., 341; or "the narrative of a past event" is inadmissible under this exception. *Wade* v. *Yale University*, 129 Conn. 615, 618, 30 A.2d 545 (1943). The underlying rationale for the admissibility of these statements is that they are trustworthy. *Mei* v. *Alterman Transport Lines, Inc.*, 159 Conn. 307, 314, 268 A.2d 639 (1970); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.11.2, p. 373.

The utterances of the two year old child, Marcus G., do not satisfy these requirements. The witness, Gloria S., testified that she had asked *leading questions* of the child, suggesting to him the names of people who might have committed the crimes. I can find no Connecticut case (and I doubt whether one exists in any other jurisdiction) in which the court properly admitted as a spontaneous utterance a declarant's statement that was made in response to a series of leading questions. Moreover, the child's responses were completely inconsistent with one another.[11] Gloria S. testified that she *twice* had asked the two year old who had been responsible for the crime scene, and that each time he had given a completely different response. The child first named "Marty," who was deceased, as the perpetrator, but then named the defendant. Indeed, the questions Gloria S. used to interrogate the child demonstrate that even

[11] It concerns me that the majority focuses merely on the leading question and the child's answer to that question. The majority never acknowledges that the previous leading question asked of the child elicited a completely contradictory response from him.

she did not have confidence in the child's answers. She explained that she first had chosen to ask Marcus G. if the crimes had been committed by Marty, yet she acknowledged that she had known when she asked that question that "Marty was already dead." She explained during her testimony that she had done so because "I wanted to see if he could distinguish the two." Obviously, even Gloria S. doubted the child's ability to identify the perpetrator correctly and then recall that person's name, and the child's contradictory responses indicated that he could not do so. Under these circumstances, the statements of the two year old child do not qualify as either spontaneous, unreflective or trustworthy.

The majority's reliance on *State* v. *Stange*, 212 Conn. 612, 563 A.2d 681 (1989), as supporting its application and interpretation of the spontaneous utterance exception, is misplaced. In *Stange*, the statement admitted into evidence neither was made in response to a leading question nor was it inconsistent with a prior statement of the declarant. In that case, the witness was a police officer who had come upon a victim of a shooting. The police officer told the court that when he "asked the victim who had shot him, [the victim] gestured toward the defendant's house and said, 'Tom Stange.' He also gave [the police officer] a description of the defendant." Id., 615–16. As indicated above, the form of the questions and the answers given by the hearsay declarant in this case were very different.

Likewise, the majority cannot rely on the residual, catchall exception to the rule against hearsay. See generally C. Tait & J. LaPlante, supra, § 11.25, p. 414. "Under the catch-all exception a court may admit a statement that is technically hearsay and does not fall within the traditional hearsay exceptions, provided: (1) there is a reasonable necessity for the admission of such statement, and (2) the statement is supported by

an adequate basis of assurance that the evidence has those qualities of reliability and trustworthiness attributed to other evidence admissible under long-established exceptions to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Boyd*, 214 Conn. 132, 140, 570 A.2d 1125 (1990), on appeal after remand, 221 Conn. 685, 607 A.2d 376, cert. denied, 506 U.S. 923, 113 S. Ct. 344, 121 L. Ed. 2d 259 (1992).[12] For the reasons I have indicated, the statements of the two year old child do not contain an adequate basis of assurance that they were either reliable or trustworthy. Furthermore, there has been no demonstration, in the trial court or in this court, that there was a "reasonable necessity" for their admission into evidence. As noted above, the state did not even attempt to admit the child's out-of-court utterances into evidence during its direct examination of the witness. The majority, therefore, cannot justify the admission into evidence of the child's statements under the test set forth in *Boyd*. Indeed, I fear that the majority's expansion of the catchall exception to accommodate the facts presented by this case may have undesirable repercussions in future cases.

Finally, under the circumstances presented by this case, the admissibility of the hearsay statements, over proper objection, would implicate the defendant's constitutional right to confront the witnesses against him. See *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980) ("In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is

[12] The majority cites an earlier case, *State* v. *Sharpe*, 195 Conn. 651, 491 A.2d 345 (1985), for its explanation of the catchall exception to the hearsay rule. Because *State* v. *Boyd*, supra, 214 Conn. 132, is a more recent case of this court, and because the language of that case differs slightly from the language employed in the earlier case, I refer to the test as set forth in *Boyd*.

admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.'').

## C

At the end of the first day of trial, at the request of the defendant, the court reappointed standby counsel as his attorneys. By that time, however, the damage already had been done. The jury had been selected and crucial witnesses had testified. Equally important, the public defenders, upon being reappointed, again emphasized to the trial court that they still were not prepared to go forward with the trial. They explained that their heavy case loads and obligations to other indigent clients had prevented them from preparing for the trial of the defendant.[13] Some of their other clients, for example, had been arrested or charged long before the defendant in this case and had not yet gone to trial.[14] Moreover, the public defenders advised the court that they had done little to prepare for the trial after the court allowed the defendant to represent himself. At that point, according to the attorneys, "[a]ll legal research ceased. All investigation ceased. Communication with our client other than on a standby role, other than [the defendant] addressing us for some specific questions, was the only communication we had."

[13] The attorneys explained their conflicting obligations to the trial court during a hearing on their motion for a mistrial. Between July, 1990, and May, 1991, one of the attorneys tried four other jury trials that occupied approximately three and one-half to four months. The other attorney tried a capital felony case that occupied approximately two and one-half to three months, and also represented defendants in ten to twelve other capital felony cases.

[14] One criminal defendant being represented by one of the public defenders had been arrested one year before the defendant in this case and had been charged with capital felony, but still had not gone to trial as of May, 1991.

Indeed, once the defendant had begun to represent himself, the state had forwarded all discovery materials directly to him, bypassing the public defenders. The trial court, faced with such a record, should have declared a mistrial.

### III

The majority concludes that "[t]he defendant in this case was not entitled to a mistrial simply on the basis of his attempt at, and then abandonment of, self-representation. Indeed, to a large extent, the defendant assumed the very risk when he elected to represent himself of which he now complains." Yet the defendant, whose intelligence level borders on mental retardation, who has serious psychological and neuropsychological problems, who had never before been to trial, and who had been confined for nearly one year under conditions equivalent to solitary confinement, cannot be judged by the same standards as we would judge a college professor. He obviously made his decision to represent himself because the system had failed him.

Furthermore, there is not a scintilla of evidence, nor does the state even suggest, that the defendant was attempting to manipulate the system by moving for a speedy trial and then asking to represent himself. Moreover, there is no indication that his disastrous attempts at jury selection and cross-examination were somehow calculated to delay or hinder justice. The defendant was not a savvy career criminal, but, rather, a person with limited intelligence and serious psychological and neuropsychological problems who was faced for the first time with the intricacies of presenting a defense in a trial by jury.

Most importantly, this case must be viewed through the lens that the state was seeking the death penalty for these murders. The state, in seeking to pursue the

death penalty, must furnish the indigent with competent representation. As any trial lawyer or judge can attest, no matter how professionally competent an attorney may be, unless the attorney is adequately prepared, the defendant is *not* being afforded competent representation. See *Siemon* v. *Stoughton*, 184 Conn. 547, 556, 440 A.2d 210 (1981) ("inadequate pretrial investigation is sufficient to constitute ineffective assistance of counsel"); *Ostolaza* v. *Warden*, 26 Conn. App. 758, 765, 603 A.2d 768, cert. denied, 222 Conn. 906, 608 A.2d 692 (1992) ("[t]he failure to conduct an adequate investigation cannot be excused in the penumbra of trial tactics"). Capital felony trials, which may result in the defendant being sentenced to death or to life in prison without any possibility of release, require not only substantial investigation but also substantial preparation for trial. In this case, the attorneys clearly were not given adequate time because of the demands of their other duties as public defenders. If the state intends to pursue the death penalty, it must furnish to an indigent defendant not only a professionally competent attorney, but also one who has sufficient time to investigate and prepare his case. The state must bear the responsibility for the lack of preparedness that worked against the defendant so disastrously in this case. The defendant's decision to proceed pro se was directly related to the inability of his court-appointed attorneys, because of their heavy case load, to prepare his defense properly and to proceed to trial.

"Timely appointment and opportunity for adequate preparation are absolute prerequisites for counsel to fulfill his constitutionally assigned role of seeing to it that available defenses are raised and the prosecution put to its proof." *Brescia* v. *New Jersey*, 417 U.S. 921, 924, 94 S. Ct. 2630, 41 L. Ed. 2d 227 (1974) (Marshall, J., dissenting). Indeed, the United States Supreme Court has held that a state's obligation to provide coun-

sel is "not discharged by an assignment at such time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." *Powell* v. *Alabama,* 287 U.S. 45, 71, 53 S. Ct. 55, 77 L. Ed. 158 (1932). In the words of Justice Thurgood Marshall: "It is axiomatic that '[t]he defendant needs counsel and counsel needs time.' *Hawk* v. *Olson,* 326 U.S. 271, 278 [66 S. Ct. 116, 90 L. Ed. 61] (1945). Here, counsel did not have 'time' and as a result [the] defendant may well have been deprived of his right to the adequate assistance of counsel guaranteed by the Constitution." *Brescia* v. *New Jersey,* supra, 926 (Marshall, J., dissenting).

Accordingly, I would reverse the judgment of the trial court and order a new trial.